# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard Allen Preparatory Charter School

v.

School District of Philadelphia and School Reform Commission, Appellants

No. 1474 C.D. 2014

Richard Allen Preparatory Charter School, Appellant

v.

School District of Philadelphia and School Reform Commission

No. 1475 C.D. 2014

Walter D. Palmer Leadership Learning Partners Charter School

v.

School District of Philadelphia and School Reform Commission, Appellants

No. 1476 C.D. 2014

Delaware Valley Charter High School

v.

School District of Philadelphia and School Reform Commission, Appellants

No. 1478 C.D. 2014

| Delaware Valley Charter High School | : | |
| :--- | :--- | :--- |
| | : | |
| | : | |
| v. | : | No. 1479 C.D. 2014 |
| | : | |
| School District of Philadelphia and School Reform Commission | : | |
| | : | |
| Appeal of: Delaware Valley Charter High School, Folk Arts-Cultural Treasures Charter School and Wakisha Charter School | : | |

| Folk Arts-Cultural Treasures Charter School | : | |
| :--- | :--- | :--- |
| | : | |
| | : | |
| v. | : | No. 1480 C.D. 2014 |
| | : | |
| School District of Philadelphia and School Reform Commission, Appellants | : | |

| Wakisha Charter School | : | |
| :--- | :--- | :--- |
| | : | |
| v. | : | No. 1483 C.D. 2014 |
| | : | |
| School District of Philadelphia and School Reform Commission, Appellants | : | |

| Wakisha Charter School | : | |
| :--- | :--- | :--- |
| | : | |
| v. | : | No. 1484 C.D. 2014 |
| | : | Argued: May 6, 2015 |
| School District of Philadelphia and School Reform Commission | : | |
| | : | |
| Appeal of: Wakisha Charter School, Delaware Valley Charter High School and Folk Arts-Cultural | : | |

Treasures Charter School                    :

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE MARY HANNAH LEAVITT, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge

OPINION
BY JUDGE LEAVITT                          FILED: August 27, 2015


           The School District of Philadelphia (School District) and its governing authority, the School Reform Commission,[1] (collectively, School District) appeal several judgments of the Court of Common Pleas of Philadelphia County (trial court) enjoining the School District from capping the enrollment of certain charter schools that were plaintiffs in this case.[2]  The Richard Allen Preparatory Charter School, the Delaware Valley Charter High School, the Walter D. Palmer Leadership Learning Partners Charter School, the Wakisha Charter School and the Folk Arts-Cultural Treasures Charter School (collectively, Charter Schools) have cross-appealed the trial court's refusal to set aside certain reporting requirements imposed upon them by School District as a condition of their charter renewal.[3]

_____

[1] On December 21, 2001, the Pennsylvania Secretary of Education issued a declaration finding the School District to be in financial distress. Consistent with Section 696 of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, added by the Act of April 27, 1998, P.L. 270, *as amended*, 24 P.S. §6–696, the School Reform Commission was established. The School Reform Commission assumed all responsibility for the operation, management and educational program of the School District.  Section 696(e)(1) of the School Code, 24 P.S. §6–696(e)(1).

[2] These charter schools filed five separate complaints, but with identical claims and counts.

[3] All five Charter Schools filed cross-appeals.  However, on December 11, 2014, this Court dismissed the cross-appeal of Walter D. Palmer Leadership Learning Partners Charter School, **(Footnote continued on the next page . . .)**

The central question in this appeal is whether School District has the statutory authority to suspend Section 1723-A(d) of the Charter School Law,[4] which specifically forbids it from imposing enrollment caps on any charter school. School District claims this authority because it believes that the School Reform Commission can suspend any provision of the Public School Code of 1949 (School Code),[5] including Section 1723-A(d). We affirm the trial court's judgment on this legal issue. We reverse the trial court's judgment, in part, on the other requirements imposed by School District upon the Charter Schools as a condition of charter renewal.

## Background

Section 1720-A(a) of the Charter School Law provides that a charter issued by a school district to a school may last for no "more than five (5) years." 24 P.S. §17-1720-A(a). Thereafter, the charter must be renewed every five years. *Id.*

The Richard Allen Preparatory Charter School was granted a charter in 2001. In 2005, when it sought a renewal, School District proposed a charter that limited its total enrollment to 400 students, and Richard Allen agreed. In 2010, when Richard Allen again sought renewal, School District proposed a charter that limited enrollment to 425 students and provided that the school would receive no

---

**(continued . . .)**
docketed at 1477 C.D. 2014, for failure to enter an appearance of counsel. Of the remaining cross-appellants, only Richard Allen Preparatory Charter School and Delaware Valley Charter High School filed a brief.

[4] Act of March 10, 1949, P.L. 30, added by the Act of July 9, 2008, P.L. 846, 24 P.S. §17-1723-A(d).

[5] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§1-101 – 27-2702.

funding for students enrolled in excess of that cap.[6]  School District's proposed charter also imposed several new requirements.  These included:  setting the school's minimum insurance levels; using School District's academic system to assess student performance; making teachers direct employees of the charter school, as opposed to the charter school's management company; adding to the Secretary of Education's format for the charter school's annual reports; advising School District of student information by using School District's computer system; giving School District advance notice of student admission lotteries; and setting up plans to identify special education needs in the School District population.  The proposed charter agreement also made all School District debts to Richard Allen unsecured obligations.  Richard Allen refused to sign School District's 2010 proposed charter agreement.

The Walter D. Palmer Leadership Learning Partners Charter School received its original charter in 2000. When it was renewed in 2005, School District proposed an enrollment cap of 675 students, and Palmer agreed.  When Palmer requested renewal in 2010, School District proposed a charter that limited enrollment to 675 students and denied funding for students enrolled in excess of that enrollment cap.  The proposed charter also included the new requirements described above.  Palmer refused to sign the 2010 proposed charter agreement.

The Delaware Valley Charter High School began operation in 2000 with an approved enrollment of 1,500 students.  When the charter was renewed in 2005, School District proposed a charter that limited enrollment to 600, and

---

[6] Funding for students enrolled in excess of the cap had not been specifically addressed in any of the Charter Schools' 2005 renewal agreements.

Delaware Valley agreed.[7]  When Delaware Valley sought renewal in 2010, School District again limited enrollment to 600 students and denied funding for students enrolled in excess of that cap.  The 2010 proposed charter also included the new requirements described above.  Delaware Valley refused to sign the 2010 proposed charter agreement.

The Folk Arts-Cultural Treasures Charter School received its charter in 2005 with an enrollment limit of 400 students.  It requested renewal in 2010. School District proposed a charter that limited enrollment to 438 students and denied funding for students enrolled in excess of that cap.  The 2010 proposed charter included the new requirements described above.  Folk Arts-Cultural refused to sign the 2010 proposed charter agreement.

The Wakisha Charter School began operation in 2000.  When it requested renewal in 2005, School District proposed an enrollment cap of 400 students, and Wakisha agreed.  When Wakisha sought renewal in 2010, School District proposed a charter that limited enrollment to 400 students and denied funding for students enrolled in excess of that cap.  The 2010 proposed charter agreement included the new requirements described above.  Wakisha refused to sign the 2010 proposed charter agreement.

In short, when School District proposed enrollment caps in 2005, the Charter Schools agreed to them.[8]  However, in 2010, the Charter Schools objected

---

[7] The trial court incorrectly states Delaware Valley's enrollment was capped at 400 students.

[8] Walter D. Palmer Leadership Learning Partners exceeded the enrollment caps set in its 2005 charter agreement for the 2008-09 and 2009-10 school years.  It then sought $1,678,579.18 from School District's basic education subsidy for students educated in excess of the enrollment cap. In *School District of Philadelphia v. Department of Education*, 92 A.3d 746 (Pa. 2014), the Pennsylvania Supreme Court noted that Palmer agreed to the student enrollment cap in its 2005 charter agreement with School District.  Therefore, Palmer was legally bound by the agreement **(Footnote continued on the next page . . .)**

to the 2010 enrollment caps proposed by School District as well as the other provisions in the proposed charter agreements listed above. In response, School District held a public meeting. Each of the Charter Schools was given three minutes to speak but none was permitted to present evidence.

The Charter Schools refused to sign School District's proposed charter agreements. Instead, they proposed charter agreements that omitted the enrollment caps and the other new requirements, which they believed not to be authorized by the Charter School Law. Each of the Charter Schools then filed a complaint with the trial court seeking declaratory and injunctive relief. After five complaints were filed, School District adopted resolutions to authorize its governing authority, the School Reform Commission,[9] to limit enrollment in charter schools and in other ways suspend provisions of the Charter School Law.

On May 20, 2013, the Charter Schools filed motions for summary judgment. The trial court granted their motions in part and denied them in part. First, the trial court invalidated the School District resolutions that authorized the School Reform Commission to impose enrollment caps upon the Charter Schools and limit their funding. Second, the trial court invalidated those provisions in the

---

**(continued . . .)**

from September 1, 2005, through June 30, 2010, and had no right to be reimbursed for enrollment in excess of the agreed-to cap. Presumably, this is what prompted School District to specifically attempt to limit funding for over-enrollment in the 2010 proposed charter agreements.

[9] Section 696 of the School Code provides that,

> [w]ithin thirty (30) days of a declaration by the Secretary of Education that a school district of the first class is distressed under section 691(c), a School Reform Commission shall be established consisting of four members initially appointed by the Governor and one member initially appointed by the mayor of the city coterminous with the school district.

24 P.S. §6–696(a). Section 696 applies to school districts of the first class, *i.e.*, Philadelphia.

5

proposed charter agreements that imposed minimum insurance requirements and made the debts of School District to the Charter Schools unsecured obligations.[10] However, the trial court denied the Charter Schools' motion for summary judgment with respect to the other requirements set forth in School District's 2010 proposed charter agreements.

On June 3, 2014, the trial court entered final judgment in favor of Charter Schools on Count I (declaratory judgment on enrollment caps); Count II (declaratory judgment on withholding of funds for enrollment in excess of cap); Count IV (partial declaratory judgment on provisions mandating certain insurance amounts and coverages and making School District debts to Charter Schools unsecured obligations); Count V (declaratory judgment that the adjudication is valid and ripe for review); and Count VII (permanent injunction against School District from imposing enrollment caps, making School District debts unsecured and imposing minimum insurance coverage requirements). The trial court entered final judgment in favor of School District on Count III (declaratory judgment on provisions requiring use of School District's performance assessments) and on Count IV (partial declaratory judgment on all new provisions in charter agreement, except as otherwise held on Count IV).[11]

---

[10] Pursuant to this condition, School District mandated that payments to the Charter Schools would constitute unsecured obligations and, thus, the Charter Schools would not have the ability to effect a lien security interest on any revenues, receipts, accounts or income of School District. School District has not appealed the grant of summary judgment to the Charter Schools on this issue.

[11] Count VI, an alternate claim regarding the trial court's jurisdiction, was dismissed as moot.

**Appeal**

School District and the Charter Schools appealed to this Court. School District argues, first, that the trial court erred in holding that it lacked the power to cap enrollment in the Charter Schools and to enforce those enrollment caps by denying funding where the caps are exceeded. Second, School District argues that requiring the Charter Schools to meet certain insurance requirements is expressly authorized by the Charter School Law.

On cross-appeal, the Charter Schools challenge the trial court's determination that School District may impose conditions pertaining to: student assessment; personnel; annual reports; use of School District's computer system to file reports; School District access to admission information; and special education obligations.

**Scope and Standard of Review**

The Charter Schools initiated their actions under the Declaratory Judgments Act, 42 Pa. C.S. §§7531-7541. It states, in relevant part, as follows:

> Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree.

42 Pa. C.S. §7532. The Charter Schools sought to enjoin School District from imposing any of the conditions in the 2010 proposed charter agreements that they believed to be unlawful.

To prevail on a claim for a permanent injunction, the plaintiff must establish a clear right to relief, that there is an urgent necessity to avoid an injury

7

which cannot be compensated for by monetary damages, and that greater injury will result from refusing rather than granting the relief requested. *Coghlan v. Borough of Darby*, 844 A.2d 624, 629 (Pa. Cmwlth. 2004). Where the injunction involves a question of law, the standard of review is *de novo* and the scope of review is plenary. *Penn Square General Corporation v. County of Lancaster*, 936 A.2d 158, 167 n.7 (Pa. Cmwlth. 2007). In all other cases, our review of the grant of a permanent injunction "is limited to determining whether the trial court committed an error of law." *Mitchell's Bar & Restaurant, Inc. v. Allegheny County*, 924 A.2d 730, 738 (Pa. Cmwlth. 2007) (quoting *Buffalo Township v. Jones*, 813 A.2d 659, 663-64 (Pa. 2002)).

The trial court granted partial declaratory and injunctive relief on the Charter Schools' motion for summary judgment. Summary judgment may be granted:

> (1)  whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2)  if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

PA. R.C.P. No. 1035.2. In an appeal of a summary judgment, our scope of review is plenary. In reviewing the trial court's order we apply the same standards for summary judgment as does the trial court. *Stimmler v. Chestnut Hill Hospital*, 981 A.2d 145, 153 (Pa. 2009) (citation omitted); *Cochrane v. Kopko*, 975 A.2d 1203, 1205 (Pa. Cmwlth. 2009). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a

8

matter of law. *Royal v. Southeastern Pennsylvania Transportation Authority*, 10 A.3d 927, 929 n.2 (Pa. Cmwlth. 2010). *See also* PA. R.C.P. No. 1035.2. We review the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. *Royal*, 10 A.3d at 929 n.2.

## Charter School Enrollment Caps

We begin with a review of the law on charter school enrollment caps. In *Foreman v. Chester-Upland School District*, 941 A.2d 108 (Pa. Cmwlth. 2008), this Court held that a school district could not limit enrollment in a charter school. We reasoned that a charter represents a broad grant of power to the charter school's board of directors to establish a school to educate school-age children.[12] Accordingly, the enrollment number was a matter for the charter school's board to decide. Chester-Upland School District appealed, and the petition for allowance of appeal was granted. *Foreman*, 951 A.2d 264 (Pa. 2008). However, that appeal was discontinued on August 11, 2008, when the General Assembly amended the Charter School Law to prohibit a school district from imposing a cap on the enrollment in a charter school without the charter school's agreement. That amendment is found in Section 1723-A(d) of the School Code, and it states as follows:

> (d)(1) *Enrollment of students in a charter school* or cyber charter school *shall not be subject to a cap or otherwise limited by any past or future action of a board of school directors,* a board of control established under Article XVII-B, a special board of control established under section 692 or *any other*

---

[12] Section 1720-A(a) provides, "[the] written charter shall be legally binding on both the local board of school directors of a school district and the charter school's board of trustees." 24 P.S. §17-1720-A(a).

9

*governing authority*, *unless agreed to by the charter school* or cyber charter school as part of a written charter pursuant to section 1720-A.

(2) The provisions of this subsection shall apply to a charter school or cyber charter school regardless of whether the charter was approved prior to or is approved subsequent to the effective date of this subsection.

24 P.S. §17-1723-A(d) (emphasis added).[13]

In its first appeal issue, School District argues that the School Reform Commission has authority to suspend Section 1723–A(d) of the Charter School Law, also known as Act 61. It claims this authority under Section 696(*i*)(3) of the School Code, which states as follows:

> (*i*) *In addition to all powers granted to the superintendent by law and a special board of control* under section 693 and *notwithstanding any other law to the contrary*, the School Reform Commission shall have the following powers:
>
> ***
>
> (3) *To suspend the requirements of this act* and regulations of the State Board of Education *except* that the school district shall remain subject to *those provisions of this act set forth in sections 1073, 1073.1, 1076, 1077, 1078, 1080, 1732-A(a), (b) and (c), 1714-B and 2104* and regulations under those sections.

24 P.S. §6-696(*i*)(3) (emphasis added). Because Section 1723-A(d) is not among the enumerated provisions of the School Code excepted from suspension, School District asserts that it may suspend Section 1723-A(d) under authority of Section 696(*i*)(3). The Charter Schools counter that Act 61 establishes a specific

---

[13] Section 1723-A(d) was added by the Act of July 9, 2008, P.L. 846, No. 2008-61, 24 P.S. §17-1723-A(d) (this amendment is commonly known as Act 61).

10

prohibition against enrollment caps by any school district, whether financially stressed or viable. As a matter of statutory construction, Act 61 must prevail over the more general and somewhat ambiguous provision set forth in Section 696(*i*)(3) of the School Code. It is ambiguous because it is unclear what was meant by the power "[t]o suspend requirements of this act," where neither "suspend" nor "act" is defined. 24 P.S. §6-696(*i*)(3).

The trial court agreed with the Charter Schools' construction of the School Code. It concluded that the policy expressed in Act 61 was unequivocal: enrollment in charter schools cannot be limited by "any past or future action of a board of school directors, a board of control ..., a special board of control ... *or any other governing authority....*" 24 P.S. §17-1723-A(d)(1) (emphasis added). Stated otherwise, the mandate applies, very specifically, to a financially distressed school district governed by a "board of control" or "other governing authority," such as the School Reform Commission. By contrast, Section 696 is a general provision that sets forth the powers and duties of the School Reform Commission to address the problems of distressed school districts of the first class, *i.e.*, Philadelphia.[14] Finding the conflict between Section 696(*i*)(3) and Section 1723-A(d) irreconcilable, the trial court followed the statutory construction principle for resolving a conflict between statutes. Our Supreme Court has described that principle as follows: "general legislation must give way to specific legislation on the same subject" and requires that *the general provisions in a law must be so interpreted as to embrace only cases to which the special provisions, on the same*

---

[14] Philadelphia is the only school district of the first class. Section 202 of the School Code provides that "[e]ach school district having a population of one million (1,000,000), or more, shall be a school district of the first class." 24 P.S. §2-202.

11

*subject are not applicable.*" *Commonwealth v. Parmar*, 710 A.2d 1083, 1091 (Pa. 1998) (opinion in support of reversal by Zappala, J.) (quoting *Commonwealth v. Brown*, 29 A.2d 793, 797 (Pa. 1943)) (emphasis in original). The trial court held that having Section 696(*i*)(3) give way to Act 61 was also consistent with the circumstances of Act 61's enactment, *i.e.*, a board of control of a distressed school district asserted that it had the power to cap the enrollment in a charter school. *Foreman*, 941 A.2d at 110.[15]

School District argues that the trial court erred. It contends that Section 696(*i*)(3) of the School Code is dispositive, and it empowers the School Reform Commission to suspend any provision of the School Code, including those provisions in the Charter School Law, with certain exceptions specifically listed therein. Notably, Section 1723-A(d), *i.e.*, Act 61, is not one of the listed exceptions.

As originally enacted in 1998, Section 696(*i*)(3) excepted only Sections 1714-B and 1732-A(a), (b) and (c) of the School Code from the School Reform Commission's suspension power. *See* Act of April 27, 1998, P.L. 270, No. 1998-46 and Act of October 30, 2001, P.L. 828, No. 2001-83. Section 1732-A(a)-

---

[15] Chester-Upland's board of control was governed by the former Education Empowerment Act, which expired pursuant to Section 1716-B of the School Code, added by the Act of May 10, 2000, P.L. 44, No. 16. The former Education Empowerment Act was set forth in expired Sections 1701-B − 1716-B of the School Code, 24 P.S. §§17-1701-B − 17-1716-B. It required the Department of Education to create an annual list of school districts with low student test scores. If the low standardized test scores continued, the school district was certified as an education empowerment district and supervised by an empowerment board. However, where a school district certified as an education empowerment district was also a financially distressed district, the former Education Empowerment Act required that the school district be supervised by a special board of control. *Former* Section 1705-B(h)(1), 24 P.S. §17-1705-B(h)(1). Because Chester-Upland was declared distressed, the empowerment board was "substituted" by a special board of control. *Foreman*, 941 A.2d at 110 n.3.

12

(c) lists the provisions of the School Code that apply to charter schools.[16] Section 1714-B was a provision of the Education Empowerment Act, which has since been

---

[16] Section 1732-A states as follows:

(a)  Charter schools shall be subject to the following:

Sections 108, 110, 111, 321, 325, 326, 327, 431, 436, 443, 510, 518, 527, 708, 736, 737, 738, 739, 740, 741, 752, 753, 755, 771, 776, 777, 808, 809, 810, 1109, 1111, 1112(a), 1301, 1310, 1317, 1317.1, 1317.2, 1318, 1327, 1330, 1332, 1303-A, 1513, 1517, 1518, 1521, 1523, 1531, 1547, 2014-A, Article XIII-A and Article XIV.

Act of July 17, 1961 (P.L. 776, No. 341), known as the "Pennsylvania Fair Educational Opportunities Act."

Act of July 19, 1965 (P.L. 215, No. 116), entitled "An act providing for the use of eye protective devices by persons engaged in hazardous activities or exposed to known dangers in schools, colleges and universities."

Section 4 of the act of January 25, 1966 (1965 P.L. 1546, No. 541), entitled "An act providing scholarships and providing funds to secure Federal funds for qualified students of the Commonwealth of Pennsylvania who need financial assistance to attend postsecondary institutions of higher learning, making an appropriation, and providing for the administration of this act."

Act of July 12, 1972 (P.L. 765, No. 181), entitled "An act relating to drugs and alcohol and their abuse, providing for projects and programs and grants to educational agencies, other public or private agencies, institutions or organizations."

Act of December 15, 1986 (P.L. 1595, No. 175), known as the "Antihazing Law."

(b)  Charter schools shall be subject to the following provisions of 22 Pa. Code:

Section 5.216 (relating to ESOL).

Section 5.4 (relating to general policies).

Chapter 11 (relating to pupil attendance).

Chapter 12 (relating to students).

Section 32.3 (relating to assurances).

Section 121.3 (relating to discrimination prohibited).

Section 235.4 (relating to practices).

**(Footnote continued on the next page . . .)**

repealed; the former Education Empowerment Act provided for the management of underperforming and financially distressed schools.[17]  When the legislature amended Section 696(*i*)(3) in 2012 to add more exceptions, it did not add Section 1723-A(d).  School District argues that this omission expresses the intention of the General Assembly to empower the School Reform Commission to impose enrollment caps on charter schools.  This interpretation, it argues, is supported by the phrase "notwithstanding any other law to the contrary" that appears in Section 696(*i*)(3).

The 2012 amendment to Section 696(*i*)(3) was one of several amendments to the School Code in Act 141 of 2012.[18]  Specifically, Act 141 added

---

**(continued . . .)**

> Section 235.8 (relating to civil rights).
>
> Chapter 711 (relating to charter school services and programs for children with disabilities).

(c)(1) The secretary may promulgate additional regulations relating to charter schools.

(2)   The secretary shall have the authority and the responsibility to ensure that charter schools comply with Federal laws and regulations governing children with disabilities. The secretary shall promulgate regulations to implement this provision.

Section 1732-A(a)-(c) of the School Code, 24 P.S. §17-1732-A(a)-(c).

[17] Section 1714-B was added to the School Code by the Act of May 10, 2000, P.L. 44, No. 16 and expired on June 30, 2010.  Under Section 1714-B, a school board was permitted to apply to the Department of Education for a waiver of any provision of the School Code, if it enabled the school district to improve its instruction program or operate in a more effective, efficient or economical manner.  Specifically it stated:

> (a)   Except as otherwise provided in this section, the board of school directors may adopt a resolution to apply for a waiver to any provision of this [School Code] ... if the waiver will enable the school district to improve its instructional program or operate in a more effective, efficient or economical manner.

*Former* 24 P.S. §17-1714-B(a).

[18] Act of July 12, 2012, P.L. 1142, No. 2012-141.

Sections 1073, 1073.1, 1076, 1077, 1078, 1080 and 2104 of the School Code to the list of exceptions in Section 696(*i*)(3) that appeared when it was enacted in 1998. These exceptions all relate to school superintendents: the election of superintendents, 24 P.S. §10-1073; the performance review of superintendents and assistant superintendents, 24 P.S. §10-1073.1; the election of assistant district superintendents, 24 P.S. §10-1076; the term and salary of assistant superintendents, 24 P.S. §10-1077; the commission of superintendents and assistant superintendents, 24 P.S. §10-1078; the removal of superintendents and assistant superintendents, 24 P.S. §10-1080; and the appointment of superintendents, 24 P.S. §21-2104. The Charter Schools argue that the 2012 amendment to Section 696(*i*)(3) is irrelevant because its single purpose was to limit the School Reform Commission's authority with respect to superintendents and assistant superintendents. The 2012 amendment to Section 696(*i*)(3) did not diminish the rights of charter schools to be free of enrollment caps to which they do not agree.

School District's argument presumes that Section 696(*i*)(3) gives the School Reform Commission broad discretion to suspend the entire School Code, with certain limited exceptions. We disagree with this premise. Section 696(*i*)(3) relieves School District of some of its duties, *i.e.,* "requirements" to which it is "subject," so long as it is financially distressed. 24 P.S. §6-696(*i*)(3). However, Section 696(*i*)(3) does not give the School Reform Commission *carte blanche* to rewrite the terms of public school education in Philadelphia for schools it operates and for charter schools operated by a board of trustees. Under School District's overbroad construction of Section 696(*i*)(3), the School Reform Commission could close every school in Philadelphia it operates so long as it kept superintendents

15

employed and continued to require charter schools to follow the mandate set forth in Section 1732-A(a)-(c) of the Charter School Law.

That Section 696(*i*)(3) relieves School District of duties, as opposed to granting it a new power to regulate charter schools, is supported by the fact that Section 1732-A, which is excepted from suspension under Section 696(*i*)(3), also relates to duties, albeit the duties of charter schools. Section 1732-A makes a number of duties of public schools applicable to charter schools. For example, public schools may *not* impose "religious or political test[s]," Section 108 of the School Code, 24 P.S. §1-108, and must establish teacher qualifications, Section 1109 of the School Code, 24 P.S. §11-1109. Pursuant to Section 1732-A(a) of the Charter School Law, charter schools are also subject to those requirements.

Further, our Supreme Court has concluded that the language of Section 1723-A(d) is unambiguous. In *School District of Philadelphia v. Department of Education*, our Supreme Court stated as follows:

> Because there is no ambiguity in the language of §1723-A(d), we look no further than the plain meaning of the statutory text to conclude that the number of students enrolled in a charter school may be subject to a cap, prior to and subsequent to the effective date of §1723-A, if the cap is included in the written charter agreed to by the charter school.

92 A.3d 746, 752 (Pa. 2014). *See also School District of Philadelphia v. Department of Education*, 45 A.3d 457 (Pa. Cmwlth. 2012) (*Freire*) (finding enrollment cap proposed by School District invalid under Section 1723-A(d)). Notably, School District did not contend in either appeal that it had the power to suspend the terms of Section 1723-A(d) under authority of Section 696(*i*)(3).

By contrast, Section 696(*i*)(3) is ambiguous, with respect to Section 1723-A(d) and with respect to the meaning of "suspend the requirements of this

16

act." Because it could not rely upon the plain language of Section 696(*i*)(3), the trial court concluded that resort to statutory construction principles was appropriate, and we agree. As noted by the trial court, when Section 1723-A(d), *i.e.,* Act 61, was enacted, School District had been governed by the School Reform Commission for years. Thus, it concluded that

> [t]he General Assembly did not enact Act 61 without taking into consideration the distressed status of the school districts within the Commonwealth of Pennsylvania including the Philadelphia School District and their statutorily created governing bodies.

Trial court op. at 17.

Act 61 specifically prohibits "any governing authority" from capping charter school enrollment, and this conflicts with School District's construction of Section 696(*i*)(3) that it may suspend Act 61. The Statutory Construction Act of 1972 states as follows:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, *the special provisions shall prevail and shall be construed as an exception to the general provision*, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa. C.S. §1933 (emphasis added). Section 1723-A(d), or Act 61, very specifically prohibits a financially distressed school district, such as School District, from imposing enrollment caps on a charter school, and its enactment in

17

2000 followed in time the 1998 enactment of Section 696(*i*)(3).[19]  If the General Assembly had wanted to exempt the School Reform Commission from the Section 1723-A(d) mandate, it would have stated so in Act 61.  Alternatively, it could have expressed that authority in the Distressed School Districts chapter of the School Code.  24 P.S. §§6-691 – 6-697.  It did neither.[20]

We affirm the trial court's construction of Section 696(*i*)(3) and Section 1723-A(d) of the School Code.  School District did not have the power to impose caps on enrollment in the Charter Schools, and its resolutions to that effect were invalid.

Likewise, School District lacked authority to enforce its enrollment caps by denying funding where the cap is exceeded.  We note, however, that where enrollment is capped by agreement of the charter school, funding in excess of that number may be withheld by a school district.  For example, in *School District of Philadelphia v. Department of Education*, 92 A.3d 746, the Pennsylvania Supreme Court held that where a charter school agrees to an enrollment cap, it cannot be reimbursed by School District for students enrolled in excess of the agreed-upon cap.

Accordingly, we affirm the trial court's judgment on the issue of enrollment caps and enforcement thereof by a denial of funding.

---

[19] The 2012 amendments to Section 696(*i*)(3) spoke to superintendents and assistant superintendents, a specific concern of the General Assembly; they are irrelevant.

[20] In order to find for School District, we would have to conclude that despite the specific mandate in Act 61, made applicable to all distressed school districts and their governing authorities, the General Assembly created a special rule for Philadelphia by not amending Section 696(*i*)(3) in 2012 to except Section 1723-A(d) from the School Reform Commission's suspension power.

**Insurance**

School District next contends that the trial court erred in setting aside the insurance condition in its proposed 2010 charter agreement. This condition required the Charter Schools "to maintain certain insurance policies, including specified levels of monetary coverage and name the School District and the [School Reform] Commission as insureds on most policies[.]" Trial Court op. at 5. School District argues that the condition was reasonable because a charter school must inform a school district how the school "will provide adequate liability and other appropriate insurance for the charter school, its employes and the board of trustees of the charter school." Section 1719-A(17) of the Charter School Law, 24 P.S. §17-1719-A(17).

Delaware Valley challenges School District's requirement to maintain a minimum level of insurance coverage and to add School District as an additional insured. It asserts that this condition infringes on its right to make decisions about its insurance coverage and will increase its premium. Richard Allen challenges only the mandate to add School District as an "additional insured" on all of its insurance policies.

The trial court found the insurance provision unreasonable because it was contrary to the Charter School Law and would defeat the General Assembly's stated purpose that charter schools are to operate independently and free from excessive regulation. In doing so it relied upon *Carbondale Area School District v. Fell Charter School*, 829 A.2d 400 (Pa. Cmwlth. 2003).

In *Carbondale*, this Court addressed the insurance requirement set forth at Section 1719-A(17) of the Charter School Law. It states, in relevant part, as follows:

An application to establish a charter school shall include all of the following information:

***

(17) How the charter school will provide adequate liability and other appropriate insurance for the charter school, its employes and the board of trustees of the charter school.

24 P.S. §17-1719-A(17). At issue in *Carbondale* was the school district's denial of a charter because the application, *inter alia*, did not provide "adequate liability and other appropriate insurance for the charter school." *Carbondale*, 829 A.2d at 410. The State Charter School Appeal Board reversed the district's decision and directed it to grant the charter school's application. This Court affirmed.

We held that the Charter School Law requires a charter school to provide "adequate" amounts of insurance and "appropriate" types of insurance. *Id.* (citing Section 1719-A(17) of the Charter School Law, 24 P.S. §17-1719-A(17)). As long as the charter school application provided for insurance, the school district had no right to impose its judgment on the amounts and types of coverage chosen by the charter school.

In this case, School District does not explain the basis for its minimum insurance requirements for the Charter Schools, but they appear to duplicate School District's own insurance policies. This exceeds School District's authority under *Carbondale*.

School District wants to be named as an additional insured to protect it from liability for actions of the Charter Schools. School District acknowledges that Section 1727-A of the Charter School Law specifically provides that "the local board of directors of a school entity shall not be held liable for any activity or

20

operation related to the program of the charter school."[21] 24 P.S. §17-1727-A. However, because this provision has not been tested in the courts, School District wants to protect itself against the cost of litigating its rights under Section 1727-A.

In support, School District points to Section 696(e)(2) and (*i*)(5) of the School Code, which allow distressed schools to "enter into agreements necessary to provide for the operation … of the school district" and "enter into agreements [to] provid[e] educational or other services to or for the school district." 24 P.S. §§6-696(e)(2), (*i*)(5). School District asserts that these statutory provisions permit it to enter into agreements with the Charter Schools that protect it from incurring the cost of defending against litigation involving a charter school. This is undoubtedly so, and it may be reasonable that School District be named an additional insured in the event it is named a defendant in an action seeking damages as a result of a charter school's act or omission. The cost is likely minimal.

However, the Charter School Law specifically states that a charter school must provide "insurance for the charter school, its employes and the board of trustees of the charter school." 24 P.S. §17-1719-A(17). There is no requirement that a charter school must provide insurance for the *school district* that

---

[21] Section 1727-A of the Charter School Law provides, in full:

> For purposes of tort liability, employes of the charter school shall be considered public employes and the board of trustees shall be considered the public employer in the same manner as political subdivisions and local agencies. The board of trustees of a charter school and the charter school shall be solely liable for any and all damages of any kind resulting from any legal challenge involving the operation of a charter school. Notwithstanding this requirement, the local board of directors of a school entity shall not be held liable for any activity or operation related to the program of the charter school.

24 P.S. §17-1727-A.

21

charters it. The issue is not whether School District may enter into an agreement on insurance with a charter school; it may. The issue is what a school district may require a charter school to do in order to renew its charter.

Accordingly, we affirm the trial court.[22]

**Cross-Appeals**

The Charter Schools challenge the trial court's determination that School District may impose requirements relating to the assessment of student performance; management of Charter School personnel; form and content of annual reports; using School District's computer system to make reports on enrollment in the Charter Schools; advance notice of student admission lotteries; and identifying and serving special education needs. The trial court found all of the above conditions "reasonable" without further discussion. Trial Court op. at 18.

The Charter Schools argue that they must accept only those conditions that are expressly required in the Charter School Law. They note that in *West Chester Area School District v. Collegium Charter School*, 812 A.2d 1172 (Pa. 2002), the Supreme Court held that a school district could not place conditions in a proposed charter school agreement that are not authorized under the Charter School Law.

At issue in *West Chester* were requirements that the charter school file monthly financial reports; provide the school district with individualized education programs; and give notice of recommended assignments for all special education students. The school district claimed it needed these conditions in the charter to be

---

[22] Charter Schools' obligation to report insurance coverage to School District remains, as does School District's ability to challenge insurance coverage to the extent it is inadequate.

22

able to provide effective oversight and protect public funds. The Supreme Court disagreed and disallowed these requirements. It reasoned as follows:

> Regardless of the purported wisdom of such an approach, the General Assembly simply did not provide for it. Although the [Charter School Law] implicitly recognizes that conditions may be placed on the grant of a charter, such conditions must be consistent with the statutory provisions. To hold to the contrary would defeat the [Charter School Law's] stated purpose to operate charter schools independently and free from excessive regulation.

*Id*. at 1182.

Here, School District argues that the Charter School Law has authorized the requirements challenged by the Charter Schools because it has responsibility to revoke or renew a charter. In support, it cites Section 1729-A(a) and (a.1) of the School Code, which state, in relevant part, as follows:

> (a) During the term of the charter or at the end of the term of the charter, the local board of school directors may choose to revoke or not to renew the charter based on any of the following:
>
>> (1) One or more material violations of any of the conditions, standards or procedures contained in the written charter signed pursuant to section 1720-A.
>>
>> (2) Failure to meet the requirements for student performance set forth in 22 Pa. Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace 22 Pa.Code Ch. 5 or failure to meet any performance standard set forth in the written charter signed pursuant to section 1716-A.
>>
>> (3) Failure to meet generally accepted standards of fiscal management or audit requirements.
>>
>> (4) Violation of provisions of this article.

(5) Violation of any provision of law from which the charter school has not been exempted, including Federal laws and regulations governing children with disabilities.

(6) The charter school has been convicted of fraud.

(a.1) *When a charter school located in a school district of the first class is in corrective action status* and seeks renewal of its charter, if the governing body of the school district of the first class renews the charter, *it may place specific conditions in the charter that require the charter school to meet specific student performance targets* within stated periods of time subject to the following:

(i) The performance targets and the periods of time in which the performance targets must be met shall be reasonable.

(ii) The placement of conditions in a charter as specified in this subsection shall not be considered an adjudication and may not be appealed to the State Charter School Appeal Board.

(iii) If the charter school fails to meet the performance targets within the stated period of time, such failure shall be sufficient cause for revocation of the charter.

24 P.S. §§17-1729-A(a), (a.1) (emphasis added).[23]

Further, Section 1728-A(a)-(c) of the School Code states:

(a) The local board of school directors shall annually assess whether each charter school is meeting the goals of its charter and shall conduct a comprehensive review prior to granting a five (5) year renewal of the charter. The *local board of school*

---

[23] "Corrective action" is a classification "indicating that a school or school district failed to meet adequate yearly progress for four or more consecutive years and requiring development of a corrective action plan." Section 102 of the School Code, 24 P.S.§1-102. None of the parties address whether any of the Charter Schools were in corrective action status.

*directors shall have ongoing access to the records and facilities* of the charter school to ensure that the charter school is in compliance with its charter and this act and that requirements for testing, civil rights and student health and safety are being met.

(b) In order to facilitate the local board's review and secretary's report, *each charter school shall submit an annual report no later than August 1 of each year to the local board of school directors* and the secretary in the form prescribed by the secretary.

(c) Five (5) years following the effective date of this article, the secretary shall contract with an independent professional consultant with expertise in public and private education. The consultant shall receive input from members of the educational community and the public on the charter school program. The consultant shall submit a report to the secretary, the Governor and the General Assembly and an evaluation of the charter school program, which shall include a recommendation on the advisability of the continuation, modification, expansion or termination of the program and any recommendations for changes in the structure of the program.

24 P.S. §§17-1728-A(a)-(c) (emphasis added).[24]

The question is whether these provisions in the Charter School Law authorize School District's imposition of the conditions that were affirmed by the trial court. We address the conditions *seriatim*.

### Student Assessment System

School District's proposed charter agreement provided that each of the Charter Schools

---

[24] School District also cites to general provisions allowing School District to implement "goals and objectives for improving academic performance" and improve "financial or educational programs of school buildings." Section 696(e)(2)(i) and (*i*)(14) of the School Code, 24 P.S. §§6-696(e)(2)(i), (*i*)(14). The provisions appear to relate to the School Reform Commission's power to improve School District programs, not charter school programs.

25

[a]dminister the School District's city wide academic assessments and meet performance standard and performance targets associated with the academic components of the School District's city-wide academic accountability systems.

Proposed Charter Agreement Article X.A.1; Reproduced Record (R.R.) at 208a.[25] Charter Schools object because there are no "city-wide academic assessments," "standards" or "targets." Further, in the five years that have passed since School District proposed this requirement, it still has not developed "city-wide academic standards." The Charter Schools argue that performance targets must "be reasonable." *See* Section 1729-A(a.1)(i) of the Charter School Law, 24 P.S. §17-1729-A(a.1)(i) (stating "[t]he performance targets and the periods of time in which the performance targets must be met shall be reasonable"). Because School District has not specified any performance standards, it is unreasonable to demand that the Charter Schools agree to them.

School District argues that it must require the Charter Schools to use uniform district-based student performance measures so that it can compare a charter school's academic performance with that of its public schools. School District does not address the heart of the Charter Schools' challenge, *i.e.*, that School District-based student performance measures do not exist.

A charter school must "participate in the Pennsylvania State Assessment System … in the manner in which the school district in which the charter school is located is scheduled to participate." Section 1715-A(8) of the Charter School Law, 24 P.S. §17-1715-A(8). School District argues that this

---

[25] The cited provision is from School District's proposed charter agreement with Richard Allen. An identical provision appears in the proposed charter agreements with the other Charter Schools.

26

provision allows it to require the Charter Schools to participate in "the same manner" as School District participates. Because the Charter Schools are bound by Section 1715-A(8), the provision in the proposed charter agreement appears redundant. However, redundancy does not render the condition invalid.

Accordingly, we affirm the trial court as to this condition.

### Personnel Management

School District's proposed charter agreement requires all teachers and instructors be direct employees of the charter school, as opposed to employees of a management company hired by the charter school. The proposed provision states as follows:

> Charter School instructional professional staff, including but not limited to the Principal, teachers and other professional instructional staff shall be direct employees or direct independent contractors of the Charter School; that is, such *professional instructional staff may not be employees or independent contractors of management or education management entities*, including but not limited to any entity functioning under a Management Agreement.

Proposed Charter Agreement Article VII.A.2; R.R. 205a (emphasis added).

Section 1715-A(12) of the Charter School Law prohibits an "administrator" from "receiv[ing] compensation from another charter school or from a company that provides management or other services to another charter school." 24 P.S. §17-1715-A(12). Further, it defines "administrator" as "the chief executive officer of a charter school and all other employes of a charter school who by virtue of their positions exercise management or operational oversight responsibilities." *Id*. The Charter Schools argue that because teachers are not administrators, they do not have to be direct employees of the Charter Schools.

27

School District counters that charter schools are public schools. Section 1724-A(a) of the Charter School Law states that the board of trustees "shall" determine the level of compensation and the employment terms and conditions of all staff, including professional staff, and that "[t]he board of trustees of a charter school shall be considered an employer for the purposes of Article XI-A." 24 P.S. §17-1724-A(a). Article XI-A, Section 1101-A of the School Code defines an "employer" as "a public school entity." 24 P.S. §11-1101-A. Likewise, the Charter School Law requires that "all employes of a charter school shall be enrolled in the Public School Employees' Retirement System" and "may organize under … the 'Public Employe Relations Act.'" Sections 1724-A(a) and (c) of the Charter School Law, 24 P.S. §§17-1724-A(a), (c). Further, every charter school employee is entitled to the same health care benefits "as the employe would be provided if he or she were an employe of the local [school] district." 24 P.S. §17-1724-A(d).

School District also relies upon *West Chester Area School District v. Collegium Charter School*, 760 A.2d 452 (Pa. Cmwlth. 2000), *aff'd*, 812 A.2d 1172 (Pa. 2002). In that case, this Court and the Pennsylvania Supreme Court affirmed the holding of the State Charter School Appeal Board that

> [n]othing in the [Charter School Law] prohibits the involvement of for-profit entities in the establishment and operation of a charter school, so long as the school itself is not for-profit, the charter school's trustees have real and substantial authority and responsibility for the educational decisions, *and the teachers are employees of the charter school itself*.

*Id.* at 468 (emphasis added).

We agree with School District. As established in *West Chester Area School District*, the teachers in the Charter Schools, as well as the administrators, must be direct employees of each Charter School's board of trustees.

Accordingly, we affirm the trial court on this issue.

**Form and Content of Annual Reports**

School District's proposed charter agreement requires the Charter Schools to submit annual reports in the form prescribed by the Secretary of Education and then also

> *provide the School District with any other records the School District, in its sole and absolute discretion* deems necessary to properly assess the performance and operations of the Charter School. If not prescribed by the Secretary, each annual report shall include the following documentation and data: (i) copies of all insurance declaration pages …; (ii) copies of building code or safety certificates; (iii) annual student suspension and expulsion data …; (iv) the schedule of Charter Board meetings for the ensuing academic year; (v) copies of all policies and manuals pertaining to students and parents …; (vi) the names and addresses of all students who were admitted outside of the lottery process, along with the reason for such exemption; and (vii) a copy of the independent financial audit….

Proposed Charter Agreement Article, IX.B; R.R. 207a-08a (emphasis added). The Charter Schools acknowledge that they must file an annual report in the form prescribed by the Secretary of Education, but they disagree that School District may expand upon the form of that report.

The Charter School Law states that "[i]n order to facilitate the local board's review and secretary's report, each charter school shall submit an annual report no later than August 1 of each year to the local board of school directors and the secretary *in the form prescribed by the secretary*." Section 1728-A(b) of the

29

Charter School Law, 24 P.S. §17-1728-A(b) (emphasis added). The form prescribed by the Secretary is as follows:

> (a) The annual report required under section 1728-A(b) of the act (24 P. S. § 17-1728-A(b)) must include:
>
>> (1) The number of children with disabilities in special education.
>>
>> (2) The services, programs and resources being implemented by the charter school or cyber charter school staff.
>>
>> (3) The services and programs utilized by the charter school or the cyber charter school through contracting with another public agency, other organizations or individuals.
>>
>> (4) The services and programs utilized by the charter school or the cyber charter school through the assistance of an intermediate unit as prescribed under sections 1725-A(a)(4) and 1744-A(3) of the act (24 P. S. §§ 17-1725-A(a)(4) and 1744-A(3)).
>>
>> (5) Staff training in special education utilized by the charter school or the cyber charter school through the Department's training and technical assistance network and intermediate unit.
>
> (b) The annual report must include an assurance that the charter school or the cyber charter school is in compliance with Federal laws and regulations governing children with disabilities and the requirements of this chapter.
>
> (c) The annual report must include the age and type of exceptionality for each enrolled child with a disability; the level of intervention provided to each child with a disability; certification of staff providing services to each child with a disability; and programs and services available to children with a disability.

22 Pa. Code §711.6.

School District argues that its additions to the annual report are reasonable. We disagree. The Charter School Law requires the Charter Schools to submit an annual report in the form required by the Secretary of Education. School District has offered no statutory authority to support its position that it may supplement the work of the Secretary on the form and content of the annual report of a charter school.

Accordingly, we reverse the trial court as to this condition.

### Reports on Students in the Charter Schools

School District proposed that the Charter Schools report student information directly onto School District's computer system. The proposed provision states:

> The Charter School shall enter into the School District Computer Network ("SCN") the *names and addresses of all students who voluntarily or involuntarily transfer out of the Charter School* within five (5) business days of the date of the transfer.

Proposed Charter Agreement Article VI.B.2; R.R. 203a (emphasis added). The Charter Schools do not challenge School District's right to this information; they challenge the requirement that they use the SCN to report this information.

The Charter Schools argue that using the SCN will require them to train staff and incur additional costs. Because the SCN is not controlled by the Charter Schools, its server issues, software problems, or connectivity issues are beyond the Charter Schools' ability to manage. This is pertinent because of the 5-day reporting deadline required by School District. The Charter Schools argue they already input this information onto the Department of Education's Information Management System, and School District's proposed condition is

31

duplicative. It represents just another attempt by School District to regulate the Charter Schools and limit their independence.

School District contends that there is nothing unreasonable about requiring submission of information in an electronic format compatible with that already used by School District. Inputting student information directly into School District's system is the simplest and least expensive method of reporting.

As established in *West Chester Area School District,* 812 A.2d at 1182 n.17, a condition in a charter must be consistent with the Charter School Law. Charter Schools concede that they are required to submit the enrollment data to School District. Article XIII(A) of the Proposed Charter Agreement states that "School District will provide all necessary software ("Technology") and training to permit the Charter School to have access to the SCN." R.R. 212a. This defeats the Charter Schools' speculative contention that using School District's software will require extensive training and perhaps require hiring additional staff. Because the Charter Schools already submit this data into the Pennsylvania Information Management System, they should be equally adept at inputting data into the SCN.

Accordingly, we affirm the trial court as to this condition.

**Student Admission Lotteries**

School District's proposed charter agreement requires each Charter School to give School District 30 days advance notice of its admission lotteries. The relevant provision states as follows:

> The Charter School shall provide the School District's Charter School Office notice of the date, time and location of any and all admissions lotteries at least thirty (30) days prior to the scheduled date of each admissions lottery. The School District reserves the right to observe the admissions lottery process.

32

Proposed Charter Agreement VI.B.6.; R.R. 203a.

The Charter Schools argue that School District cannot make this requirement mandatory because Section 1728-A(a) of the Charter School Law already gives a chartering school district

> ongoing access to the records and facilities of the charter school to ensure that the charter school is in compliance with its charter and this act and that requirements for testing, civil rights and student health and safety are being met.

24 P.S. §17-1728-A(a). The Charter Schools argue that there is a difference between having "access" and making "reports." They explain that their doors are open to School District for inspection of their records. This does not mean, however, that School District can require the Charter Schools to remit whatever information School District deems relevant and by a date certain. School District counters that its right to access means that the School Reform Commission "may obtain the information whenever it needs it." School District Brief on Cross-Appeals at 44.

Again, the question is not School District's right to information but, rather, its ability to require the Charter Schools to collect and package that information in a manner to School District's liking. Section 1723-A of the Charter School Law states as follows:

> (a) All resident children in this Commonwealth qualify for admission to a charter school within the provisions of subsection (b). If more students apply to the charter school than the number of attendance slots available in the school, then students must be selected on a random basis from a pool of qualified applicants meeting the established eligibility criteria and submitting an application by the deadline established by the charter school, except that the charter school may give preference in enrollment to a child of a parent who has actively participated in the development of the charter school and to

siblings of students presently enrolled in the charter school. First preference shall be given to students who reside in the district or districts.

(b)(1) A charter school shall not discriminate in its admission policies or practices on the basis of intellectual ability, except as provided in paragraph (2), or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language or any other basis that would be illegal if used by a school district.

(2) A charter school may limit admission to a particular grade level, a targeted population group composed of at-risk students, or areas of concentration of the school such as mathematics, science or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.

(c) If available classroom space permits, a charter school may enroll nonresident students on a space-available basis, and the student's district of residence shall permit the student to attend the charter school.

24 P.S. §17-1723-A.

School District is entitled to records to determine whether the Charter Schools are admitting students in the manner required by Section 1723-A. However, it does not follow that School District may place the onus on the Charter Schools to format this information and provide it in accordance with School District's timetable. Notably, School District does not argue that it cannot obtain the information simply by calling the charter school, visiting the school or accessing the school's website.

Accordingly, we reverse the trial court on this issue.

34

**Special Education Outreach**

School District's proposed charter agreement requires each Charter School to do special education outreach. The proposed condition states:

> The Charter School shall operate the Charter School as a Local Education Agency ("LEA") with respect to NCLB, to Child Find pursuant to 22 Pa. Code §14.121, and to the provisions of special education services under IDEA.

Proposed Charter Agreement IV.D; R.R. 200a. The Charter Schools challenge this condition because they are exempt from Title 22, Chapter 14 of the Pennsylvania Code.[26]

The Charter Schools do not deny that they have obligations to special education students and that they have Child Find obligations under Section 711.21 of the Pennsylvania Code. However, their obligations are to "all children with disabilities *who are enrolled in the charter school*[.]" 22 Pa. Code §711.21 (emphasis added). By contrast, Chapter 14 requires school districts to "adopt and use a public outreach awareness system to locate and identify children thought to be eligible for special education within the school district's jurisdiction." 22 Pa. Code §14.121.

School District calls the Charter Schools' challenge as no more than the identification of a typographical error. Nevertheless, the Charter Schools are correct that they are exempt from Chapter 14 of the Pennsylvania Code. Therefore, we agree that if School District wishes to address this issue in the

---

[26] The regulation specifically states that "*[c]harter schools* and cyber charter schools *are exempt from Chapter 14* (relating to special education services and programs)." 22 Pa. Code §711.2(c) (emphasis added).

charter school agreement, it must delete the reference to 22 Pa. Code §14.121. It may add a citation to Chapter 711 of Title 22 of the Pennsylvania Code.

Accordingly, we reverse the trial court on this issue.

**Conclusion**

In sum, we affirm the order of the trial court insofar as it denied School District the right to unilaterally place caps on enrollment, limit funding, and impose conditions on the Charter Schools' insurance coverage. We reverse the trial court's order finding the proposed conditions reasonable regarding assessment of student performance, the form and content of annual reports, the use of the School District's computer network to make reports on enrollments, advance notice of admissions lotteries, and special education outreach. In all other respects, we affirm.

_____
MARY HANNAH LEAVITT, Judge

Judge Cohn Jubelirer and Judge Brobson did not participate in the decision in this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard Allen Preparatory Charter : 
School : 
  : 
  : 
v. : No. 1474 C.D. 2014 
  : 
School District of Philadelphia and : 
School Reform Commission, : 
                Appellants : 


Richard Allen Preparatory Charter : 
School, : 
                Appellant : 
  : 
v. : No. 1475 C.D. 2014 
  : 
School District of Philadelphia and : 
School Reform Commission : 


Walter D. Palmer Leadership : 
Learning Partners Charter School : 
  : 
v. : No. 1476 C.D. 2014 
  : 
School District of Philadelphia and : 
School Reform Commission, : 
                Appellants : 


Delaware Valley Charter High : 
School : 
  : 
v. : No. 1478 C.D. 2014 
  : 
School District of Philadelphia and : 
School Reform Commission, : 
                Appellants :

Delaware Valley Charter High : 
School : 
 : 
 : 
v. : No. 1479 C.D. 2014
 : 
School District of Philadelphia and : 
School Reform Commission : 
 : 
Appeal of: Delaware Valley Charter : 
High School, Folk Arts-Cultural : 
Treasures Charter School and : 
Wakisha Charter School : 


Folk Arts-Cultural Treasures Charter : 
School : 
 : 
 : 
v. : No. 1480 C.D. 2014
 : 
School District of Philadelphia and : 
School Reform Commission, : 
            Appellants : 


Wakisha Charter School : 
 : 
 : 
v. : No. 1483 C.D. 2014
 : 
School District of Philadelphia and : 
School Reform Commission, : 
            Appellants : 


Wakisha Charter School : 
 : 
 : 
v. : No. 1484 C.D. 2014
 : 
School District of Philadelphia and : 
School Reform Commission : 
 : 
Appeal of: Wakisha Charter School, : 
Delaware Valley Charter High : 
School and Folk Arts-Cultural :

Treasures Charter School          :

# **O R D E R**

AND NOW, this 27th day of August, 2015, the order of the Court of Common Pleas of Philadelphia County, dated July 7, 2014, is AFFIRMED in part and REVERSED in part, in accordance with the attached opinion.

_____
MARY HANNAH LEAVITT, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard Allen Preparatory Charter : 
School :
 :
v. : No. 1474 C.D. 2014
 :
School District of Philadelphia and :
School Reform Commission, :
             Appellants :

Richard Allen Preparatory Charter :
School, :
             Appellant :
 :
v. : No. 1475 C.D. 2014
 :
School District of Philadelphia and :
School Reform Commission :

Walter D. Palmer Leadership :
Learning Partners Charter School :
 :
v. : No. 1476 C.D. 2014
 :
School District of Philadelphia and :
School Reform Commission, :
             Appellants :

Delaware Valley Charter High :
School :
 :
v. : No. 1478 C.D. 2014
 :
School District of Philadelphia and :
School Reform Commission, :
             Appellants :

| | | |
|---|---|---|
| Delaware Valley Charter High School | : | |
| | : | |
| | : | |
| v. | : | No. 1479 C.D. 2014 |
| | : | |
| School District of Philadelphia and School Reform Commission | : | |
| | : | |
| | : | |
| Appeal of:  Delaware Valley Charter High School, Folk Arts-Cultural Treasures Charter School and Wakisha Charter School | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Folk Arts-Cultural Treasures Charter School | : | |
| | : | |
| | : | |
| v. | : | No. 1480 C.D. 2014 |
| | : | |
| School District of Philadelphia and School Reform Commission, | : | |
| Appellants | : | |
| | : | |
| Wakisha Charter School | : | |
| | : | |
| v. | : | No. 1483 C.D. 2014 |
| | : | |
| School District of Philadelphia and School Reform Commission, | : | |
| Appellants | : | |
| | : | |
| Wakisha Charter School | : | |
| | : | |
| v. | : | No. 1484 C.D. 2014 |
| | : | Argued:  May 6, 2015 |
| School District of Philadelphia and School Reform Commission | : | |
| | : | |
| Appeal of:  Wakisha Charter School, Delaware Valley Charter High School and Folk Arts-Cultural Treasures Charter School | : | |

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
              HONORABLE ROBERT SIMPSON, Judge
              HONORABLE MARY HANNAH LEAVITT, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge


CONCURRING AND DISSENTING
OPINION BY
PRESIDENT JUDGE PELLEGRINI          FILED: August 27, 2015


I dissent from the portion of the majority's opinion regarding the School Reform Commission's authority to suspend Section 1723-A(d) of the Charter School Law[1] relating to charter school enrollment caps because Section 696(*i*)(3) of the Public School Code of 1949 (School Code)[2] specifically empowers it to do so.

---

[1] Act of March 10, 1949, P.L. 30, added by Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §17-1723-A(d). Section 1723-A(d) states:

> (d)(1) Enrollment of students in a charter school or cyber charter school shall not be subject to a cap or otherwise limited by any past or future action of a board of school directors, a board of control established under Article XVII-B, a special board of control established under section 692 or any other governing authority, unless agreed to by the charter school or cyber charter school as part of a written charter pursuant to section 1720-A.

> (2) The provisions of this subsection shall apply to a charter school or cyber charter school regardless of whether the charter was approved prior to or is approved subsequent to the effective date of this subsection.

[2] Act of March 10, 1949, P.L. 30, added by Act of April 27, 1998, P.L. 270, *as amended*, 24 P.S. §6-696(*i*)(3). Section 696(*i*)(3) states:

> (*i*) In addition to all powers granted to the superintendent by law and a special board of control under section 693 and notwithstanding any

**(Footnote continued on next page…)**

As indicated, Section 696(*i*)(3) specifically empowers the School Reform Commission to suspend the requirements of the School Code and the Charter School Law and the related regulations except for the sections of those statutes enumerated therein.[3]  Because the General Assembly did not include Section 1723-

---

**(continued…)**

> other law to the contrary, the School Reform Commission shall have the following powers:
>
> \*   \*   \*
>
> (3) To suspend the requirements of this act and regulations of the State Board of Education except that the school district shall remain subject to those provisions of this act set forth in sections 1073, 1073.1, 1076, 1077, 1078, 1080, 1732-A(a), (b) and (c), 1714-B and 2104 and regulations under those sections.

[3] As the Pennsylvania Supreme Court has explained:

> [O]ur paramount interpretative task is to give effect to the intent of our General Assembly in enacting the particular legislation under review.  *See* 1 Pa. C.S.[] §1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.  Every statute shall be construed, if possible, to give effect to all its provisions."); *Nationwide Ins. Co. v. Schneider*, [960 A.2d 442, 448 (Pa. 2008)].  Generally, the best indication of the General Assembly's intent may be found in the plain language of the statute.  *Martin v. Commonwealth Dep't of Transp. Bureau of Driver Licensing*, [905 A.2d 438, 443 (Pa. 2006)].  In this regard, "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include." *Commonwealth v. Rieck Investment Corp.*, [213 A.2d 277, 282 (Pa. 1965)].  Consequently, "[a]s a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says[;] [o]ne must also listen attentively to what it does not say." *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, [788 A.2d 955, 962 (Pa. 2001)] (internal quotations omitted).

**(Footnote continued on next page…)**

A(d) of the Charter School Law as one of Section 696(*i*)(3)'s enumerated exceptions, the School Reform Commission is specifically empowered thereby to suspend the charter school enrollment cap requirements of Section 1723-A(d) notwithstanding the fact that it is more specific than the general powers conferred by Section 696(*i*)(3) or that it was enacted later in time.

Further, contrary to the majority's assertion, Section 696(*i*)(3) is not ambiguous with respect to its application to Section 1723-A(d). While there may be an instance in which we should rightly determine that the School District of Philadelphia (School District) is inappropriately applying this provision beyond its proper scope, this is not that case and Section 696(*i*)(3) clearly states that it applies "notwithstanding any other law to the contrary" and is not merely limited to the employment of superintendents or the requirements of Section 1732-A.[4] As a result, the majority erred in ignoring the unambiguous and explicit provisions of Section 696(*i*)(3) of the School Code in disposing of this appeal. *See* Section 1922(2) of the Statutory Construction Act, 1 Pa. C.S. §1922(2) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); Section 1924 of the Statutory Construction Act, 1

---

**(continued…)**

*Piper Group, Inc. v. Bedminster Township Board of Supervisors*, 30 A.3d 1083, 1091-92 (Pa. 2011) (citation omitted).

[4] 24 P.S. §17-1732-A. As noted by the majority, Section 1732-A makes a list of statutes and regulations that are applicable to public schools applicable to charter schools as well.

DRP - 3

Pa. C.S. §1924 ("Exceptions expressed in a statute shall be construed to exclude all others.").[5]

Accordingly, I respectfully dissent from that part of the majority's opinion affirming the trial court on the issue of the charter school enrollment caps and the denial of funding where the caps are exceeded; I concur in the remainder of the majority's opinion.

_____
DAN PELLEGRINI, President Judge

---

[5] Nevertheless, to the extent that Section 696(*i*)(3) is ambiguous, it makes perfect sense that the General Assembly excluded the School Reform Commission from the requirements of Section 1723-A(d) and permitted it to maintain the current caps on the number of students in charter schools in the School District to prevent the further dilution of the School District's already limited financial resources. *See, e.g., Delaware County v. First Union Corporation*, 992 A.2d 112, 118-19 (Pa. 2010) (holding that in undertaking the analysis of an ambiguous statute, the court may consider the object to be attained by the statute under review, as well as the consequences of specific interpretations, and the manner in which the General Assembly would likely have intended the statute to interact with the other legislation implicated by the underlying circumstances).